# IN THE SUPREME COURT OF TEXAS

═══════════

No. 16-0006

═══════════

ROHRMOOS VENTURE, ERIC LANGFORD, DAN BASSO, AND TOBIN GROVE,
PETITIONERS,

v.

UTSW DVA HEALTHCARE, LLP, RESPONDENT

═══════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

═══════════════════════════════════════════

**Argued October 31, 2018**

JUSTICE GREEN delivered the opinion of the Court.

In this case, we must decide whether a tenant can terminate a commercial lease contract for the landlord's prior material breach. We hold that under *Davidow v. Inwood North Professional Group–Phase I*, 747 S.W.2d 373 (Tex. 1988), termination is a justified remedy when the landlord breaches the commercial lease. We also must consider whether the evidence offered to prove attorney's fees is sufficient under our precedent for fee-shifting awards. We hold that it is not. When a fee claimant seeks to recover attorney's fees from an opposing party, it must put on evidence of reasonable hours worked multiplied by a reasonable hourly rate, yielding a base figure that can be adjusted by considerations not already accounted for in either the hours worked or the rate. Because the record does not contain this evidence, we affirm the

court of appeals' judgment in part, reverse as to the award of attorney's fees, and remand the case to the trial court for further proceedings.

## I. Background

Landlord Rohrmoos Venture executed a commercial lease with tenant UT Southwestern DVA Healthcare, LLP (UTSW), for a commercial building in Dallas, Texas.[1] UTSW used the commercial building for a dialysis clinic. At some point UTSW began experiencing water penetration in the building's concrete foundation and installed ceramic floor tiles because of the moisture problems.

Around September 2007, state health inspectors evaluated UTSW's dialysis clinic and criticized the facility because some ceramic floor tiles had come loose from the concrete slab and moisture could be seen under the tiles. UTSW notified Rohrmoos of the inspection results and over the following months, the two exchanged extensive communication in an attempt to diagnose and fix the issue. Neither party accepted responsibility. Multiple engineers and contractors were called in, but the issue persisted into 2009 and then began to worsen as the building apparently suffered significant water penetration.

Because UTSW viewed the commercial building as unsuitable for its intended commercial purpose, UTSW terminated its lease early, vacated the premises, and relocated to Irving, Texas, while still allegedly owing approximately $250,000 in unpaid rent. UTSW then sued Rohrmoos and the joint-venturers behind it for breach of contract and breach of the implied warranty of suitability. UTSW also sought declaratory judgment that: (1) a casualty occurred in

---

[1] Rohrmoos's and UTSW's predecessors executed the original lease in 1996. Rohrmoos and UTSW modified and ratified that original lease agreement in March 2003.

accordance with the lease, (2) Rohrmoos failed to remedy the casualty, and (3) UTSW had the right to terminate the lease. Rohrmoos answered with several affirmative defenses, including waiver and prior material breach. Rohrmoos also counterclaimed for negligence and breach of contract. UTSW asserted its own affirmative defenses to Rohrmoos's counterclaims.

The case was submitted to a jury. The jury found that UTSW and Rohrmoos both failed to comply with the lease, that Rohrmoos failed to comply first, and that Rohrmoos breached the implied warranty of suitability. Although UTSW initially sought money damages, it did not submit that claim to the jury. Accordingly, no money damages were awarded to UTSW.

Regarding attorney's fees, the parties' lease agreement provided for a fee-shifting arrangement whereby "the prevailing party shall be entitled to an award for its reasonable attorneys' fees" from the non-prevailing party "[i]n any action to enforce the terms of [the] Lease." In an attempt to prove the reasonableness and necessity of the requested attorney's fees at trial, UTSW's attorney, Wade Howard, testified that he had twenty years of litigation experience, the standard rate he charges is $430 per hour, he has handled cases similar in nature to this one before, and a reasonable and necessary number of hours to spend on this case would be around 750 to 1,000. Those hours multiplied by his standard hourly rate equals between $322,500 and $400,000, so he testified that a reasonable and necessary fee would be between $300,000 and $400,000. But then Howard went on to state, "This case, for whatever reason, has not been worked up in a reasonable fashion. . . . But because of that, the fees in this case are much closer -- my fees are much closer to 800 -- over $800,000." He gave some examples of why the cost of this litigation was so high—searching through "millions" of emails and

3

reviewing "hundreds of thousands" of documents during discovery, over forty depositions taken, and a forty-page motion for summary judgment. Howard did not explain how much time was spent on each of those tasks, however, and it was clear that not all the tasks he performed were included in his testimony. Rather, he stated that the factors relevant to his attorney's fees were (1) the amount in controversy, (2) the complexity of the case, and (3) his knowledge and experience—three of the eight factors set out in *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). The jury determined reasonable attorney's fees for both UTSW and Rohrmoos at $800,000 for representation in the trial court, $150,000 in the court of appeals, and $75,000 for representation in this Court.

The trial court entered final judgment against Rohrmoos, stating:

1.      [Rohrmoos] materially breached the lease agreement first.

2.      [Rohrmoos] breached the implied warranty of suitability.

3.      Because [Rohrmoos] materially breached the lease agreement first and breached the implied warranty of suitability, UTSW had the right to terminate the lease agreement.

4.      Rohrmoos Venture takes nothing on all of its claims against UTSW and Counter-Defendants . . . .

The trial court awarded UTSW attorney's fees in the amount determined by the jury—totaling $1,025,000 with the conditional appellate awards. Rohrmoos moved to reform the judgment or, alternatively, for a new trial. The trial court denied the motion.

Because the trial court's judgment authorized UTSW to *terminate* the commercial lease, Rohrmoos, on appeal, attacked the jury's finding that it breached the implied warranty of suitability established under *Davidow*. *See Davidow*, 747 S.W.2d at 377 (holding that "there is

4

an implied warranty of suitability by the landlord in a commercial lease that the premises are suitable for their intended commercial purpose"). Rohrmoos reasoned that unless *Davidow* is waived under the lease or the lease contains a provision that supersedes *Davidow*'s implied warranty of suitability, a tenant can terminate a commercial lease only by proving a breach of the implied warranty of suitability. Otherwise, posited Rohrmoos, why would a commercial tenant go through the rigors of proving a *Davidow* breach if instead it could obtain the same remedy—termination—by merely convincing a jury that the landlord had materially breached the lease? Rohrmoos therefore devoted most of its briefing to challenging the jury's finding that it breached *Davidow*'s implied warranty of suitability. Rohrmoos did not challenge the jury's finding that it materially breached the lease.

The court of appeals initially missed Rohrmoos's primary argument under *Davidow*, largely because Rohrmoos did not brief the *Davidow* issue fully. On this point, the court of appeals held:

> All of [Rohrmoos's *Davidow* arguments] are irrelevant unless Rohrmoos also defeats the answers to questions one through three [of the jury charge], which support [UTSW]'s prior material breach of contract defense to Rohrmoos's counterclaim. But, as discussed later, Rohrmoos does not properly challenge the sufficiency of the evidence to support the jury's breach of contract findings. And unchallenged jury findings are binding on this court.

559 S.W.3d 155, 160 (Tex. App.—Dallas 2015, pet. granted) (mem. op.) (footnote omitted) (citation omitted).

Rohrmoos filed a motion for reconsideration, asserting that the court of appeals overlooked Rohrmoos's primary argument under *Davidow* that a material breach of contract

does not support the termination of a commercial lease. The court of appeals withdrew its

opinion, vacated its judgment, and published a new opinion with the following language:

> Rohrmoos's motion for reconsideration improperly now argues that we should ignore the answers to Questions One through Three [of the jury charge] because the right to terminate a commercial lease for failure to make repairs exists only with respect to a breach of the implied warranty of suitability that the Supreme Court established in *Davidow v. Inwood North Professional Group–Phase I*, 747 S.W.2d 373, 376–77 (Tex. 1988) and does not exist for a prior material breach of an express duty [to] repair contained in the lease. But Rohrmoos did not assert that objection to Questions One through Three in the trial court, or otherwise preserve the point in the trial court. *See* TEX. R. CIV. P. 274 ("A party objecting to a charge must point out distinctly the matter to which he objects and the grounds of his objection.").

*Id.* at 163. The court of appeals decided Rohrmoos's remaining points of error against

Rohrmoos and affirmed the trial court's judgment. *See id.* at 160–64, 169.

Regarding the $1,025,000 in attorney's fees, Rohrmoos challenged the award in the court

of appeals on two grounds: (1) UTSW was not a "prevailing party" under the lease and therefore

was not entitled to recover attorney's fees, and (2) the evidence was insufficient to support the

fee award.[2] *Id.* at 164–66. The court of appeals disagreed with Rohrmoos on both counts,

holding that UTSW was a "prevailing party" under the lease, and that *El Apple I, Ltd. v. Olivas*,

370 S.W.3d 757 (Tex. 2012), and its progeny, which use the "lodestar method" for calculating

attorney's fees, do not apply in this case. 559 S.W.3d at 165–68. The court of appeals further

held that billing records are not required to prove attorney's fees, and testimony about the

---

[2] Rohrmoos also argued that UTSW was not entitled to recover attorney's fees under the Declaratory Judgment Act because UTSW allegedly abandoned its declaratory judgment claim prior to trial. *See* TEX. CIV. PRAC. & REM. CODE § 37.009 (stating that "[i]n any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just"). The court of appeals declined to address this issue because it affirmed the award of attorney's fees on other grounds. *See* 559 S.W.3d at 164–65.

attorney's experience, the total amount of fees, and the reasonableness of the fees complied with *Arthur Andersen* and supported the fee award. *Id.* at 167–68. Rohrmoos petitioned this Court for review, and we granted the petition. 61 Tex. Sup. Ct. J. 1505 (June 22, 2018).

## II. *Davidow*'s Implied Warranty of Suitability

Rohrmoos raises many arguments in this Court involving the *Davidow* implied warranty of suitability. Rohrmoos argues primarily that the court of appeals incorrectly assumed that a material breach of a commercial lease can justify termination, resulting in a holding that is contrary to our decision in *Davidow*. However, there are preservation concerns surrounding this issue, which we address first before turning to the applicability of *Davidow*'s implied warranty of suitability.

### A. Preservation

Rohrmoos maintains that the issue of whether a tenant can terminate a commercial lease based on the landlord's prior material breach is properly preserved for our review. Refuting the court of appeals' holding that Rohrmoos did not object to the jury charge based on its *Davidow* theory, or otherwise preserve the point in the trial court, Rohrmoos contends that the issue is legal and not factual—meaning it can be raised at any time, including on appeal. Rohrmoos also claims that it nevertheless did raise the issue repeatedly in the trial court and correctly preserved the issue for review in the court of appeals and this Court.

UTSW, on the other hand, argues that the *Davidow* issue is not properly before this Court. First, UTSW argues that Rohrmoos did not object to the jury charge regarding material breach and assert its *Davidow* theory in the trial court, thereby waiving the right to appeal the

7

issue. Second, even if the *Davidow* argument had been preserved in the trial court, UTSW argues that Rohrmoos did not adequately brief the issue in the court of appeals, thus waiving the issue there. And finally, UTSW asserts that Rohrmoos waived the issue in this Court by not challenging the court of appeals' application of the law on preservation and waiver in its petition for review.

After a careful review of the record, we agree with Rohrmoos that the *Davidow* issue is preserved for our review. Importantly, the availability of termination as a remedy did not become an issue until the trial court entered judgment authorizing termination. When that happened, Rohrmoos promptly filed a motion to reform the judgment or, alternatively, for a new trial. In that motion, Rohrmoos asserted that "under Texas law, a tenant claiming material breach of lease is *not* entitled to terminate the lease unless the lease expressly provides for that remedy." Rohrmoos cited *Davidow*, saying that "[t]his is still the law in Texas today." This gave the trial court notice of Rohrmoos's complaint that the verdict and judgment were at least partially based on a theory of recovery that Rohrmoos contends did not support termination as a matter of law. *Cf. United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 482 (Tex. 2017) (holding that the preservation requirement was satisfied because the defendant raised the issue of an improper theory of recovery that could not support the judgment in a motion for judgment notwithstanding the verdict). Regarding the jury charge, there was no need to object because it did not mention termination as a remedy or ask whether UTSW was entitled to terminate.

Furthermore, whether a tenant can terminate a commercial lease under *Davidow* for material breach is a question of law for the court to decide, and it is not one which must be

8

resolved before the jury can properly perform its fact-finding role. *See Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (per curiam) (holding that a party's failure to object at the charge conference regarding attorney's fees was not fatal because "[t]he availability of attorney's fees under a particular statute is a question of law for the court" and is not one that must be answered before the jury can properly determine the facts in the case). A jury can determine whether there was a breach of contract, which party breached first, and whether there was a breach of the implied warranty of suitability—as the jury did here—and it can do all of this whether or not termination is an available remedy under *Davidow* for material breach of a commercial lease.

Additionally, the record indicates that Rohrmoos raised its argument under *Davidow* in the trial court. In a trial brief, Rohrmoos stated specifically that a commercial tenant "may not terminate the lease" unless it proves a breach of the implied warranty of suitability. Likewise, during trial, Rohrmoos's counsel explained:

> Their allegation on [breach of contract] is that the landlord failed in his duty to repair, that's their allegation. Under Texas law, that does not entitle a party to terminate the contract. It entitles them to repair it and then to collect back from the landlord, there's an offset for rent. . . . So, if we breached because we did not do repairs, if that's what the jury agrees to, it does -- they aren't entitled to terminate, that's a remedy they aren't entitled to. They're entitled to damages.

When the trial court pressed for case law supporting this position, Rohrmoos's counsel responded, "I'm hanging my hat on *Davidow*, . . . [which says] as a matter of Texas law, a breach of the duty to repair is only remediable by damages." In no sense can we say that Rohrmoos failed to inform the trial court of its theory under *Davidow*. Indeed, our law on preservation is built almost entirely around putting the trial court on notice so that it can cure any

9

error. *See Burbage v. Burbage*, 447 S.W.3d 249, 258 (Tex. 2014) ("Preservation of error reflects important prudential considerations recognizing that the judicial process benefits greatly when trial courts have the opportunity to first consider and rule on error." (citing *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003))). Affording trial courts an opportunity to correct errors conserves judicial resources and prevents an appeal by ambush or otherwise having to order a new trial. *Id.* Here, there is no such concern because the trial court was given an opportunity to cure any error when it entered judgment and later in response to Rohrmoos's post-judgment motion. Rohrmoos properly preserved this issue in the trial court.

Rohrmoos also raised the argument in the court of appeals. We have firmly mandated that courts broadly construe issues to encompass the core questions and to reach all issues subsidiary to and fairly included within them. *See Ditta v. Conte*, 298 S.W.3d 187, 190 (Tex. 2009); *see also* Tex. R. App. P. 38.9 ("Because briefs are meant to acquaint the court with the issues in a case and to present argument that will enable the court to decide the case, substantial compliance with [briefing rules] is sufficient . . . ."). This mandate must be applied "reasonably, yet liberally," so that the merits of an appeal are addressed whenever "reasonably possible." *Ditta*, 298 S.W.3d at 190 (citing *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008) (per curiam)). Fairly subsumed in Rohrmoos's briefing to the court of appeals is the challenge to the trial court's judgment based on Rohrmoos's contention that, under *Davidow*, UTSW was not entitled to terminate the lease based on the landlord's prior material breach.[3] The argument also

---

[3] We note that Rohrmoos relied heavily on *Davidow* in its briefing to the court of appeals. Although unclear at times, there are multiple instances in which Rohrmoos presented its theory that *Davidow* does not allow the remedy of termination upon a showing that the landlord materially breached the commercial lease. Rohrmoos asserted:

10

clearly appears in Rohrmoos's reply brief to the court of appeals, although that is neither controlling nor dispositive regarding a litigant's duty to brief issues before appellate courts.[4] *See* TEX. R. APP. P. 38.1(f) (stating that the appellant's opening brief "must state concisely all issues or points presented for review"). And while Rohrmoos may not have briefed *Davidow*'s holding as a specifically enumerated issue, we have long rejected any form-over-substance approach that leads to a rigid application of our preservation rules. *See Thota v. Young*, 366 S.W.3d 678, 690 (Tex. 2012); *see also Burbage*, 447 S.W.3d at 258 (holding that our

---

UTSW's claims of breach of lease from failing to make repairs should have been dealt with on their proper foundation in fact and law, the remedy being money damages. "Thus, a tenant is still under a duty to pay rent even though his landlord has breached his covenant to make repairs." *Davidow v. Inwood North Prof. Group-Phase I*, 747 S.W.2d 373, 375 (Tex. 1988) (confirming that failure to make repairs does not justify rescission).

. . . .

A lease property can obviously experience repair issues without causing the landlord to be in breach of the lease. Were this not so, the implied warranty of suitability created in *Davidow* would have been completely unnecessary since the concept of "breach" (or "material breach" in Mr. Howard's world) would have already provided the identical remedy of rescission.

. . . .

Even if Rohrmoos had failed to repair property defects (which it did not), the remedy under Texas law for a tenant in that situation is money damages. . . . For recompense, the tenant can sue for damages or it can make the repairs itself and deduct the cost from rent owed. What a tenant *cannot* do is claim "breach of lease" from repairs not being performed on its preferred timetable and then vacate the premises years later. If that were the law, the *slightest* unrepaired defect in the property: a burned-out light bulb, would afford the tenant with the *harshest* remedy known to the law: rescission. And, as shown above, if that were the law, there would have been no need for the warranty of unsuitability.

[4] Rohrmoos argued:

Indeed, if UTSW was correct, and if a "material" breach allowed for lease termination, then the Supreme Court's decision in *Davidow* was totally unnecessary. After all, what is the purpose of adopting the *Davidow* warranty if every lease can already be "materially" breached and that alone would allow for termination/rescission? The fact is, before *Davidow*, a landlord's breach of a commercial lease afforded the tenant with only limited recourse—which did *not* include termination or refusal to pay rent. For UTSW to continue to argue that "material breach" allows for termination is contrary to over 100 years of Texas law and renders the *Davidow* factors irrelevant.

"procedural rules are technical, but not trivial," and courts must "construe such rules liberally so that the right to appeal is not lost unnecessarily"). The entirety of Rohrmoos's briefing rests on the premise that *Davidow* does not allow UTSW to terminate the lease for Rohrmoos's material breach. This was sufficient to put the court of appeals on notice of Rohrmoos's understanding regarding *Davidow*, and to invite the court of appeals to correct any error of law as to *Davidow* and the availability of termination as a remedy.

Rohrmoos likewise adequately presented the argument in its petition for review and briefing in this Court. We now turn to the merits of Rohrmoos's *Davidow* argument and the availability of termination for material breach of a commercial lease.

### B. Remedy of Termination

Rohrmoos's position is that *Davidow* expressly prohibits termination as a remedy for material breach of a commercial lease. All this Court said in *Davidow*, however, is that there is an implied warranty of suitability in commercial leases, and what the implied warranty means:

> Therefore, we hold there is an implied warranty of suitability by the landlord in a commercial lease that the premises are suitable for their intended commercial purpose. This warranty means that at the inception of the lease there are no latent defects in the facilities that are vital to the use of the premises for their intended commercial purpose and that these essential facilities will remain in a suitable condition. If, however, the parties to a lease expressly agree that the tenant will repair certain defects, then the provisions of the lease will control.

747 S.W.2d at 377. The Court did not, as Rohrmoos contends, make an absolute statement that a material breach of a commercial lease will never justify termination. In fact, if anything, the holding in *Davidow* leans the other way.

12

In *Davidow*, this Court addressed the implications of independent covenants in our property law, concluding that they were antiquated and unworkable in the modern lease setting. *See id.* at 375–77. The opinion begins with the observation that "[a]t common law, the lease was traditionally regarded as a conveyance of an interest in land, subject to the doctrine of *caveat emptor*." *Id.* at 375. Once the landlord delivered the right of possession to the tenant, the tenant had a duty to pay rent as long as he was in possession. *Id.* This was true "even if the buildings on the leasehold were destroyed or became uninhabitable." *Id.* All lease covenants at common law were thus considered independent because the tenant, being in possession of everything he was entitled to under the lease, had to pay rent no matter what lease covenant the landlord breached. *Id.*

This outdated common law concept, *Davidow* noted, "is no longer indicative of the contemporary relationship between the tenant and landlord." *Id.* at 376. Therefore, this Court first did away with independent covenants in residential leases in *Kamarath v. Bennett*, 568 S.W.2d 658, 660–61 (Tex. 1978), *superseded by statute*, Act of May 28, 1979, 66th Leg., R.S. ch. 780, §§ 1–18, 1979 Tex. Gen. Laws 1978. In that case, the Court implicitly held that the residential tenant's obligation to pay rent is dependent upon the landlord's performance under the then newly created warranty of habitability. *See id.*

> The Court then extended *Kamarath*'s reasoning to commercial leases in *Davidow*:
>
> We recognized in *Kamarath* that the primary objective underlying a residential leasing arrangement is "to furnish [the tenant] with quarters suitable for living purposes." The same objective is present in a commercial setting. A commercial tenant desires to lease premises suitable for their intended commercial use. A commercial landlord impliedly represents that the premises are in fact suitable for that use and will remain in a suitable condition. The tenant's obligation to pay

13

> rent and the landlord's implied warranty of suitability are therefore mutually
> dependent.

747 S.W.2d at 377 (alteration in original) (citation omitted). Although the last sentence refers to the tenant's obligation to pay rent as being dependent on the landlord's implied warranty of suitability, there is no reason to conclude that the Court in *Davidow* did not intend to extend that same dependency to the landlord's obligations under the lease.

Indeed, the courts of appeals that have addressed a landlord's material breach in *residential* lease settings have held that termination is an available remedy. *See, e.g.*, *Pala v. Maxim*, No. 01-01-00618-CV, 2002 WL 188567, at *4–5 (Tex. App.—Houston [1st Dist.] Feb. 7, 2002, no pet.) (not designated for publication) (holding that the tenant was excused from all obligations to perform under the lease when the landlord materially breached the lease by not replacing the countertops in the premises). And the courts of appeals that have addressed this issue in *commercial* lease settings have held the same. *See, e.g.*, *Clark v. Porter*, No. 04-08-00520-CV, 2009 WL 2618359, at *3–4 (Tex. App.—San Antonio Aug. 26, 2009, pet. denied) (mem. op.) (noting that the tenant's obligations under the commercial lease could terminate and be excused by the landlord's earlier material breach); *Parts Indus. Corp. v. A.V.A. Servs., Inc.*, 104 S.W.3d 671, 680–81 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.) (approving the tenant's proper use of non-payment of rent as a remedy for breach of the landlord's express obligations under the commercial lease to repair a leaky roof). Rohrmoos cites no authority that has interpreted *Davidow* to mean that a tenant cannot terminate a commercial lease for material breach of the contract. This is because there is none, and we see no reason to hold otherwise.

To be clear, *Davidow* stands for the proposition that in a commercial lease, a landlord warrants that the property is suitable for the tenant's intended commercial purpose. 747 S.W.2d at 377. This implied warranty exists separately and apart from any obligation the landlord may have under the lease. *See id.* As a matter of law, the implied warranty is limited only by specific terms in the parties' commercial lease whereby a tenant expressly agrees to repair certain defects. *Id.* Parties are also free to contract out of the implied warranty by expressly waiving it in their contract. *See Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007) (holding that an "as is" clause that expressly waived *Davidow*'s implied warranty of suitability was sufficient to waive the implied warranty). Termination is available as a remedy for breach of the implied warranty of suitability. *See Davidow*, 747 S.W.2d at 377. The same holds true for a landlord's material breach of the commercial lease.

Because we agree with the court of appeals that Rohrmoos did not properly preserve its challenge as to UTSW's breach of contract claim, as discussed below,[5] the jury's finding that Rohrmoos materially breached the lease stands, and we cannot disturb that part of the trial court's judgment. We need not and do not address Rohrmoos's remaining arguments regarding the implied warranty of suitability under *Davidow*.[6]

---

[5] *See* discussion *infra* Part III.

[6] Rohrmoos asserts many arguments in an attempt to negate the jury's finding that Rohrmoos breached the *Davidow* implied warranty of suitability, including: (1) no competent evidence supports the finding that the *Davidow* implied warranty was breached; (2) UTSW waived its *Davidow* warranty claims because it remained on the property and continued to use the facility; (3) the parties agreed to an express warranty in the lease under Article 13 that superseded *Davidow* and therefore made *Davidow*'s implied warranty inapplicable as a matter of law; and (4) there is an "as is" clause in the lease that renders *Davidow*'s implied warranty inapplicable as a matter of law. None of these arguments are helpful to Rohrmoos, however, unless it also defeats the jury's finding that it materially breached the commercial lease.

15

### III. Breach of Commercial Lease

After the court of appeals issued its opinion holding that Rohrmoos did not properly challenge the sufficiency of the evidence supporting the jury's breach of contract finding, Rohrmoos argued in its motion for reconsideration in the court of appeals that it did, in fact, challenge the jury's finding that Rohrmoos materially breached the lease. That is, notwithstanding Rohrmoos's clear headings in its opening briefing to the court of appeals and ensuing arguments—all challenging the implied warranty of suitability—Rohrmoos claims that the evidence UTSW used to prove that Rohrmoos breached the implied warranty of suitability is the same evidence UTSW used to prove that Rohrmoos materially breached the lease. A challenge to one is a challenge to all, argues Rohrmoos.

We disagree. At no point in its briefing to the court of appeals did Rohrmoos challenge the sufficiency of the evidence with respect to the jury's finding that Rohrmoos materially breached the lease. Nothing in Rohrmoos's briefing put the court of appeals on notice of such a challenge, even when read liberally. Moreover, we are not prepared to do away with our preservation requirements altogether by holding that Rohrmoos's challenge to the evidence supporting a breach of the implied warranty of suitability fairly subsumes a challenge to the evidence supporting a breach of contract. The two causes of action are different, each with entirely different elements that must be specifically pled, argued, and proved with supporting evidence. A challenge as to whether the plaintiff satisfied its burden of proof for one cause of action does not, by implication, challenge the evidence as to a separate cause of action. Had Rohrmoos not intended to base its challenge solely on *Davidow*, it should have argued

16

alternative theories in the court of appeals to include a sufficiency challenge regarding material breach. Rohrmoos did not do so. This issue is not preserved for our review.

## IV. Attorney's Fees

In Texas, as in the federal courts, each party generally must pay its own way in attorney's fees. *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010) ("The general rule in our legal system is that each party must pay its own attorney's fees and expenses."); *Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 41 (Tex. 2012) ("As a general rule, litigants in Texas are responsible for their own attorney's fees and expenses in litigation."). But there are certain circumstances in which the prevailing party can recover fees from the opposing party. *See Baker Botts LLP v. ASARCO LLC*, 135 S. Ct. 2158, 2164 (2015) ("Our basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252–53 (2010))); *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 809 (Tex. 2017) (orig. proceeding) ("Texas follows the American rule on attorney's fees, which provides that, generally, 'a party may not recover attorney's fees unless authorized by statute or contract.'" (quoting *Wheelabrator Air Pollution Control, Inc. v. City of San Antonio*, 489 S.W.3d 448, 453 n.4 (Tex. 2016))). When fee-shifting is authorized, whether by statute or contract, the party seeking a fee award must prove the reasonableness and necessity of the requested attorney's fees. *See, e.g.*, *Kinsel v. Lindsey*, 526 S.W.3d 411, 427 (Tex. 2017) ("The party seeking recovery bears the burden of proof to support the award."); *Nat'l Lloyds*, 532 S.W.3d at 809

("When fee-shifting is authorized, the party seeking to recover those fees bears the burden of establishing the fees are reasonable and necessary." (citing *In re Bent*, 487 S.W.3d 170, 184 (Tex. 2016) (orig. proceeding); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991))).

With that in mind, we consider the two arguments Rohrmoos raises against the $1,025,000 award of attorney's fees. First, Rohrmoos argues that UTSW is not a "prevailing party" under this Court's precedent and is therefore not entitled to attorney's fees. Second, even if UTSW could be considered a prevailing party, Rohrmoos contends there was legally insufficient evidence to support UTSW's award of attorney's fees. We address each in turn.

## A. Prevailing Party

The parties' contract provided that "[i]n any action to enforce the terms of this Lease, the prevailing party shall be entitled to an award for its reasonable attorneys' fees." The lease did not further define the term "prevailing party." Rohrmoos cites our decision in *Intercontinental Group Partnership v. KB Home Lone Star LP*, 295 S.W.3d 650 (Tex. 2009), to assert that courts should apply section 38.001 of the Texas Civil Practice and Remedies Code when a contract leaves the term "prevailing party" undefined. *See id.* at 653 (analyzing the applicability of Chapter 38 to a contract that did not define the term "prevailing party"); *see also* TEX. CIV. PRAC. & REM. CODE § 38.001(8) ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract."). We have held that "[t]o recover attorney's fees under section 38.001, a party must (1) prevail on a cause of action for which attorney's fees are

18

recoverable, and (2) recover damages." *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997). But here, no damages were sought or awarded under the jury charge.

Although instructive, Chapter 38 and *Green International* are not controlling in this case. "Parties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38's." *KB Home*, 295 S.W.3d at 653. The commercial lease here plainly states that "[i]n any action to enforce the terms of this Lease, the prevailing party shall be entitled to an award for its reasonable attorneys' fees." Nothing in that contract provision requires that a party receive any damages, as we have held is required under Chapter 38. *See Green Int'l*, 951 S.W.2d at 390. The operative event under the contract is that a party prevail "[i]n any action to enforce the terms of [the] Lease." That is sufficiently different and less stringent than Chapter 38's standards, rendering section 38.001 inapplicable. The question remains, however, whether UTSW is a prevailing party under the contract when it did not seek or obtain monetary damages.

In *KB Home*, we considered whether the plaintiff prevailed for purposes of attorney's fees when the jury found that the defendant violated the contract but awarded no money damages to the plaintiff. 295 S.W.3d at 652. Like the commercial lease in this case, the contract in *KB Home* did not define "prevailing party." *Id.* We held, after looking to the plain meaning of the term "prevailing party," that the plaintiff did not prevail for purposes of attorney's fees because to prevail requires a plaintiff to "prove compensable injury and secure an enforceable judgment in the form of damages or equitable relief." *Id.* The plaintiff recovered no damages, secured no declaratory or injunctive relief, obtained no consent decree or settlement in its favor,

19

and received nothing of value of any kind. *Id.* at 655. No misconduct was deterred or punished, nor did we "perceive any manner in which the outcome materially altered the legal relationship between" the plaintiff and defendant. *Id.* (citing *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992), which held that to prevail for a claimant means obtaining actual and meaningful relief, something that materially alters the legal relationship of the parties)). KB Home, the plaintiff, sought more than $1,000,000 in damages, but instead left the courthouse with nothing. *Id.*

At first blush, *KB Home*'s holding appears damning to UTSW, but in that case we examined only what a *plaintiff* must prove to be a "prevailing party." *See id.* at 652 (holding that "a plaintiff must prove compensable injury and secure an enforceable judgment in the form of damages or equitable relief"). Here, although UTSW was the original plaintiff, it argues that it successfully defended—*as a defendant*—against Rohrmoos's breach of contract counterclaim. This is true. In an attempt to relieve itself of its future obligations to perform under the contract, UTSW sought a jury finding that Rohrmoos breached the lease first. The jury found that both Rohrmoos and UTSW breached the lease but that Rohrmoos breached first. The trial court entered judgment accordingly and ordered that Rohrmoos take nothing on its counterclaim for approximately $250,000 in back rent. The court of appeals employed this logic to hold that UTSW, as counter-defendant, was the prevailing party because it was vindicated by the court's judgment. 559 S.W.3d at 166 (citing *Johnson v. Smith*, No. 07-10-00017-CV, 2012 WL 140654, at *3 (Tex. App.—Amarillo Jan. 18, 2012, no pet.) (mem. op.)).

Interestingly, this specific question regarding prevailing defendants presented itself in *KB Home*, but we did not address it because it was not preserved for our review. *See* 295

S.W.3d at 659 ("The issue of whether a breaching-but-nonpaying defendant can be a 'prevailing party' under an attorney's-fees provision like this is interesting legally, but not before us procedurally."). We did hold, however, that to prevail means to "obtain actual and meaningful relief, something that materially alters the parties' legal relationship." *Id.* at 652 (citing *Farrar*, 506 U.S. at 111–12). Since *KB Home*, courts of appeals have held that a defendant who did not recover actual damages can be a prevailing party for defending against a plaintiff's breach of contract claim when it achieves a material alteration in its legal relationship with the plaintiff. *See, e.g.*, *SEECO, Inc. v. K.T. Rock, LLC*, 416 S.W.3d 664, 674 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (holding that a successful breach of contract defense entitled the defendant to attorney's fees as the prevailing party); *Fitzgerald v. Schroeder Ventures II, LLC*, 345 S.W.3d 624, 629 (Tex. App.—San Antonio 2011, no pet.) (concluding that there was no basis for denying the defendants attorney's fees under the contract with a "prevailing party" provision after analyzing and agreeing with another intermediate appellate court that held *KB Home* did not apply to attorney's fees sought by a defendant defending against a claim for breach of contract).

We agree. A defendant can obtain actual and meaningful relief, materially altering the parties' legal relationship, by successfully defending against a claim and securing a take-nothing judgment on the main issue or issues in the case. Our holding is consistent with the United States Supreme Court's interpretation of what it means to prevail as a defendant. *See CRST Van Expedited, Inc. v. Equal Emp't Opportunity Comm'n*, 136 S. Ct. 1642, 1651 (2016) ("The defendant may prevail even if the court's final judgment rejects the plaintiff's claim for a

nonmerits reason."). Here, UTSW was not just a plaintiff; it also successfully defended against Rohrmoos's breach of contract counterclaim, and the trial court rendered a take-nothing judgment in UTSW's favor as a counter-defendant. The jury's finding and the trial court's judgment altered the legal relationship between the parties. UTSW is therefore a "prevailing party" under the lease and is entitled to reasonable and necessary attorney's fees.

## B. Legal Sufficiency

The jury awarded $800,000 in attorney's fees for trial work and conditional fee awards of $150,000 for appeal to the intermediate appellate court and $75,000 for appeal to this Court. The trial court's judgment awarded UTSW fees according to the verdict and ordered that Rohrmoos take nothing. In this Court, Rohrmoos challenges the evidence offered by UTSW's attorney, Wade Howard, as legally insufficient to support the fee awards, claiming that the lodestar method applies and Howard should have submitted detailed proof, likely in the form of billing records, so the jury could have conducted a meaningful review to determine the reasonableness of the fees. Howard did not attempt to introduce billing records into evidence, nor did he testify to the details of his work, which Rohrmoos claims prevented the jury from determining whether the hundreds of hours spent were reasonable or necessary. Rohrmoos asserts that this award of more than $1,000,000 in attorney's fees cannot be based on the *ipse dixit* of the testifying expert. UTSW, on the other hand, argues that Howard's testimony is

22

sufficient to support the fee award under *Arthur Andersen* because Howard testified to the total amount of fees, the reasonableness of the fees, and his experience.[7]

Before addressing the parties' arguments and the evidence presented in this case, we first examine the law governing attorney's fees in a fee-shifting situation. In short, to secure an award of attorney's fees from an opponent, the prevailing party must prove that: (1) recovery of attorney's fees is legally authorized, and (2) the requested attorney's fees are reasonable and necessary for the legal representation, so that such an award will compensate the prevailing party generally for its losses resulting from the litigation process.

## 1. Legally Authorized

Legal authorization begins, as we have mentioned, with the American Rule, which provides that a prevailing party has no inherent right to recover attorney's fees from the non-prevailing party unless there is specific statutory or contractual authority allowing it. *E.g.*, *Nat'l Lloyds*, 532 S.W.3d at 809; *Tony Gullo Motors I, LP v. Chapa*, 212 S.W.3d 299, 310–11 (Tex. 2006) (observing that Texas law has followed the American Rule for more than a century). When fee-shifting is authorized, whether by statute or contract, there are a few key principles that serve as the basis for our attorney's fee jurisprudence.

---

[7] To support its position, UTSW relies heavily on case law from courts of appeals that developed after our decision in *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757 (Tex. 2012), for the proposition that testimony regarding the total amount of fees, the reasonableness of the fees, the number of hours worked, the average hourly rate, the nature of the case, and the attorney's experience is sufficient to support a fee award under *Arthur Andersen. See, e.g.*, *Metroplex Mailing Servs., LLC v. RR Donnelley & Sons Co.*, 410 S.W.3d 889, 900 (Tex. App.—Dallas 2013, no pet.) ("It has consistently been held that an attorney's testimony about his experience, the total amount of fees, and the reasonableness of the fees charged is sufficient to support an award." (citing *In re A.B.P.*, 291 S.W.3d 91, 99 (Tex. App.—Dallas 2009, no pet.))); *Woodhaven Partners, Ltd. v. Shamoun & Norman, LLP*, 422 S.W.3d 821, 846 (Tex. App.—Dallas 2014, no pet.) (citing *Metroplex* for the same proposition).

First, the idea behind awarding attorney's fees in fee-shifting situations is to compensate the prevailing party generally for its reasonable losses resulting from the litigation process. *See generally In re Nalle Plastics Family Ltd. P'ship*, 406 S.W.3d 168, 173 (Tex. 2013) (orig. proceeding) (observing that although attorney's fees are not awarded as damages, they can be viewed as compensating the prevailing party for its losses because the award helps make the party whole). The award and the ability to enforce it thus belongs to the party, not the attorney, absent express statutory or contractual text mandating otherwise. *See, e.g.*, TEX. FAM. CODE § 6.708(c) (providing that the court may award reasonable attorney's fees and expenses in suits for the dissolution of marriage, and "[t]he court may order the fees and expenses and any postjudgment interest to be paid directly to the attorney, who may enforce the order in the attorney's own name by any means available for the enforcement of a judgment for debt").

Second, because such fee awards are compensatory in nature, fee-shifting is not a mechanism for greatly improving an attorney's economic situation. *Cf. Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986) (noting that fee-shifting statutes are enacted to "enable private parties to obtain legal help in seeking redress for injuries" and not to improve significantly the financial lot of attorneys as a form of economic relief, "nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client"). Thus, only fees reasonable and necessary for the legal representation will be shifted to the non-prevailing party, and not necessarily the amount contracted for between the prevailing party and its attorney, as a client's agreement to a certain fee arrangement or obligation to pay a particular amount does not necessarily establish that fee

as reasonable and necessary. *See Arthur Andersen*, 945 S.W.2d at 818 ("[W]e cannot agree that the mere fact that a party and a lawyer have agreed to a contingent fee means that the fee arrangement is in and of itself reasonable for purposes of shifting that fee to the defendant."). Stated differently, an amount incurred or contracted for is not conclusive evidence of reasonableness or necessity. *See id.* The fee claimant still has the burden to establish reasonableness and necessity. *Nat'l Lloyds*, 532 S.W.3d at 809.

Third, a party must be represented by an attorney to secure an award of attorney's fees. For example, courts have held that a corporate client can be awarded fees for representation by its in-house counsel. *See, e.g.*, *Tesoro Petrol. Corp. v. Coastal Ref. & Mktg., Inc.*, 754 S.W.2d 764, 766–67 (Tex. App.—Houston [1st Dist.] 1988, writ denied) ("[T]he award of reasonable attorney's fees for services performed by in-house counsel compensates the prevailing party for time counsel could have spent on other corporate matters." (citing *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1396–97 (7th Cir. 1983))). Likewise, courts have held that a law firm can be awarded fees for representation by its own attorney. *See, e.g.*, *Campbell, Athey & Zukowski v. Thomasson*, 863 F.2d 398, 400 (5th Cir. 1989) (citing *Tesoro* to hold that "[j]ust as the corporation should be entitled to compensation for the time which in-house counsel could have spent on other corporate matters, so is a law firm entitled to compensation for the time which the representing attorney could have spent on other client matters"). Attorneys have been awarded fees for their own pro se representation.[8] *E.g.*, *Beckstrom v. Gilmore*, 886 S.W.2d 845,

---

[8] The United States Supreme Court takes a different view regarding attorney pro se representation, at least under the Civil Rights Attorney's Fees Award Act of 1976. *See generally Kay v. Ehrler*, 499 U.S. 432, 435–36 (1991)

25

847 (Tex. App.—Eastland 1994, writ denied) (awarding fees to an attorney representing himself pro se). *But see Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 299–300 (Tex. 2011) (denying attorney's fees to a pro se attorney because the attorney did not incur the fees as required by the applicable statute). And the State of Texas can be awarded fees under certain statutes for representation by Attorney General's Office attorneys. *See, e.g.*, TEX. GOV'T CODE § 402.006(c) ("In a case in which the state is entitled to recover a penalty or damages the attorney general is entitled, on behalf of the state, to reasonable attorney's fees and court costs."); *Merchs. Fast Motor Lines, Inc. v. State*, 917 S.W.2d 518, 523–24 (Tex. App.—Waco 1996, writ denied) (upholding the State's attorney's fee award under section 402.006(c)).

Here, the parties' contract provides for a fee-shifting arrangement by stating, "In any action to enforce the terms of this Lease, the prevailing party shall be entitled to an award for its reasonable attorneys' fees." The contract does not define "reasonable" attorney's fees, so we turn to our attorney's fee jurisprudence in considering reasonableness.

## 2. Reasonable and Necessary

As an initial matter, we note that parties in their contracts and the Legislature in its enabling statutes will often loosely employ a reasonable and necessary standard, sometimes using both terms "reasonable and necessary" and other times just "reasonable." *Compare* TEX. BUS. & COM. CODE § 17.50(d) ("Each consumer who prevails [under the Deceptive Trade Practices Act] shall be awarded court costs and reasonable and necessary attorneys' fees."), *with*

(denying attorney's fees to a pro se attorney because "the word 'attorney' assumes an agency relationship, and it seems likely that Congress contemplated an attorney-client relationship as the predicate for an award under § 1988" of the Act (footnotes omitted)).

TEX. CIV. PRAC. & REM. CODE § 38.001 (providing that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs" for, among other things, breach of contract). The distinction between such provisions is immaterial. When a claimant wishes to obtain attorney's fees from the opposing party, the claimant must prove that the requested fees are both reasonable and necessary. *See Nat'l Lloyds*, 532 S.W.3d at 809 (stating that a party seeking recovery of attorney's fees from the losing party "bears the burden of establishing the fees are reasonable *and* necessary" (emphasis added)). Both elements are questions of fact to be determined by the fact finder and act as limits on the amount of fees that a prevailing party can shift to the non-prevailing party. *See Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 231 (Tex. 2010) (observing that generally the reasonableness of particular fees presents a fact question that the fact finder must decide, as does necessity); *see also Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) (explaining that reasonableness is a question of fact for the jury, and that "[t]he second limitation, that fees must be necessary, is likewise a fact question" (citing *Gen. Motors Corp. v. Bloyed*, 916 S.W.2d 949, 961 (Tex. 1996))).

Furthermore, some enabling statutes have an explicit reference to attorney's fees that are "incurred." *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 74.351(b)(1) (allowing the recovery of "reasonable attorney's fees and costs of court incurred by the physician or health care provider" for certain situations under the Texas Medical Liability Act); *id.* § 27.009(a)(1) (providing for recovery of "court costs, reasonable attorney's fees, and other expenses incurred in defending against the legal action as justice and equity may require" under the Texas Citizens Participation

27

Act). In those instances, we have held that the word "incurred," just as the word "reasonable," acts to limit the amount of fees the court may award, and "[a] fee is incurred when one becomes liable for it." *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010) (holding that "[b]oth the adjective 'reasonable' and the verb 'incurred' [in section 74.351(b)(1)] act to limit the amount of attorney's fees the trial court may award"); *see also Jackson*, 351 S.W.3d at 299–300 (denying a pro se attorney fees under the Texas Public Information Act, which has an "incurred" requirement, because he "did not incur attorney's fees as that term is used in its ordinary meaning because he did not at any time become liable for attorney's fees"). As we have explained, attorney's fee awards are compensatory in nature, intended generally to make the prevailing party whole as to reasonable and necessary fees for successfully prosecuting or defending against a claim. *See Nalle Plastics*, 406 S.W.3d at 173. But when statutes do not contain an explicit requirement that fees be "incurred," *e.g.*, TEX. CIV. PRAC. & REM. CODE § 38.001, we do not imply such a term; rather, we evaluate whether legally sufficient evidence supports that the amount of attorney's fees awarded is reasonable and necessary for the legal representation, so that an award of such fees will compensate the prevailing party generally for its losses resulting from the litigation process.[9] *See, e.g.*, *Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014) (per curiam). And when contracts provide for recovery of attorney's fees, we similarly do not imply terms but adhere to the parties' intent as expressed in the language of the

---

[9] We note that section 38.004 of the Civil Practice and Remedies Code authorizes a court, in certain proceedings involving fee-shifting under section 38.001, to take judicial notice of usual and customary attorney's fees. TEX. CIV. PRAC. & REM. CODE § 38.004 ("The court may take judicial notice of the usual and customary attorney's fees and of the contents of the case file without receiving further evidence in: (1) a proceeding before the court; or (2) a jury case in which the amount of attorney's fees is submitted to the court by agreement."). In such instances, there is a rebuttable presumption that the usual and customary fees are reasonable. *Id.* § 38.003 ("It is presumed that the usual and customary attorney's fees for a claim of the type described in Section 38.001 are reasonable.").

28

contract. *See URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018) (noting that "our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument"). Here, because there is no "incurred" requirement on the face of the contract, we evaluate whether legally sufficient evidence supports that the amount of attorney's fees awarded is reasonable and necessary for the legal representation, so that a fee-shifting award will compensate the prevailing party generally for its losses resulting from the litigation process.

Historically, claimants have proven reasonableness and necessity of attorney's fees through an expert's testimony—often the very attorney seeking the award—who provided a basic opinion as to the requested attorney's fees. *See generally Penn Mut. Life Ins. v. Maner*, 109 S.W. 1084, 1084 (Tex. 1908). In recent years, Texas law has developed with references to the *Arthur Andersen* method (sometimes referred to as the "traditional" method) and the lodestar method for proving the reasonableness and necessity of attorney's fees. *See, e.g.*, *Metroplex Mailing Servs.*, 410 S.W.3d at 900 (suggesting that "[u]nder the traditional method of awarding fees, [as opposed to the lodestar method,] documentary evidence is not a prerequisite"). The court of appeals in this case referenced both methods, distinguishing them and concluding that "Rohrmoos does not assert, and the record does not show, that the lodestar method was statutorily required or that [UTSW] 'chose to prove up attorney's fees using this method.'" 559 S.W.3d at 167 (citations omitted). The court of appeals then affirmed the attorney's fee award, holding that "Howard's testimony concerning his experience, the total amount of fees, and the reasonableness of the fees charged was sufficient to support the award" under *Arthur Andersen*. *Id.* at 168.

29

These two seemingly different methods for evaluating claims for attorney's fees have created confusion for practitioners and courts alike. As explained below, however, the lodestar method developed as a "short hand version" of the *Arthur Andersen* factors and was never intended to be a separate test or method. With that in mind, we clarify the law governing recovery of attorney's fees in Texas courts. We begin by reviewing fee-shifting and attorney's fee jurisprudence in the federal courts.

### a. *Johnson* Factors and Lodestar in Federal Courts

To assist district courts in awarding attorney's fees, the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), set out twelve factors that a court should consider in determining a reasonable fee. *Id.* at 717–19. Those factors, consistent with the American Bar Association's Code of Professional Responsibility then in effect, included:

> (1) the time and labor required;
> (2) the novelty and difficulty of the questions;
> (3) the skill requisite to perform the legal service properly;
> (4) the preclusion of other employment by the attorney due to acceptance of the case;
> (5) the customary fee;
> (6) whether the fee is fixed or contingent;
> (7) time limitations imposed by the client or the circumstances;
> (8) the amount involved and the results obtained;
> (9) the experience, reputation, and ability of the attorneys;
> (10) the "undesirability" of the case;
> (11) the nature and length of the professional relationship with the client; and
> (12) awards in similar cases.

*Id.* *Johnson* was widely followed by other courts. *E.g.*, *Reynolds v. Coomey*, 567 F.2d 1166, 1167 (1st Cir. 1978) (observing that the district court properly applied the *Johnson* factors as a guide in determining the amount of attorney's fees); *Allen v. Amalgamated Transit Union Local*

*788*, 554 F.2d 876, 884 (8th Cir. 1977) (approving the *Johnson* factors for determining the reasonableness of attorney's fee claims). But as the United States Supreme Court observed, this method "gave very little actual guidance to district courts" and "[s]etting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results." *Del. Valley Citizens' Council*, 478 U.S. at 563.

For this reason, the Third Circuit developed the lodestar method for calculating reasonable attorney's fees. *See Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.* (*Lindy I*), 487 F.2d 161, 167–68 (3d Cir. 1973); *see also Del. Valley Citizens' Council*, 478 U.S. at 563–65 (providing a historical analysis of the development of the lodestar method). This method involved two steps. *See Lindy I*, 487 F.2d at 167–68. First, for each attorney involved, the court was to multiply the hours reasonably spent on the case by a reasonable hourly rate of compensation to form a base number or "lodestar." *Id.* Second, the court could then adjust this lodestar figure to account for whether the expenses incurred and hours invested were based on a contingent agreement (i.e., without assurances of compensation), as well as the quality of the work performed, as evidenced by the recovery obtained and complexity of the case. *See Lindy Bros. Builders, Inc. of Phil. v. Am. Radiator & Standard Sanitary Corp.* (*Lindy II*), 540 F.2d 102, 117 (3d Cir. 1976). This lodestar formulation produced a more focused analysis than the *Johnson* factors by emphasizing the objective consideration of amount of time expended by the attorneys. *See Del. Valley Citizens' Council*, 478 U.S. at 563 (explaining that the lodestar "formulation emphasized the amount of time expended by the attorneys, and provided a more analytical framework for lower courts to follow than the

31

unguided 'factors' approach provided by *Johnson*"). It also allowed for greater consistency in awards of attorney's fees, although "allowing the courts to adjust the lodestar amount based on considerations of the 'riskiness' of the lawsuit and the quality of the attorney's work could still produce inconsistent and arbitrary fee awards." *Id.*

The United States Supreme Court refined the lodestar method in *Hensley v. Eckerhart*, 461 U.S. 424 (1983), adopting a hybrid approach for calculating reasonable attorney's fees that shared elements of both the lodestar method and *Johnson* factors. *See id.* at 433–35. The Court explained: "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Id.* at 433. The Court's analysis was consistent with the lodestar's first step described by the Third Circuit, but then the Court we went on to state: "The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward . . . ." *Id.* at 434. The "other considerations" included, but were not limited to, the *Johnson* factors, but the Court made clear that many of the factors listed in *Johnson* would usually be "subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Id.* at 434 n.9 (citation omitted).

The Court further refined its views on the appropriate method for determining a reasonable fee award in *Blum v. Stenson*, 465 U.S. 886 (1984), again affirming its preference for the lodestar method. *See id.* at 888. Consistent with previous rulings, *Blum* explained that the

proper first step in determining a reasonable attorney's fee is to multiply "the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Id.* But the Court went a step further, emphasizing that this base calculation is not an initial approximation of the final award to be made but is instead a presumed reasonable fee if the applicant "has carried his burden of showing that the claimed rate and number of hours are reasonable." *Id.* at 897. The *Blum* Court also restricted the adjusting factors courts could use to increase or decrease the base lodestar amount. *See id.* at 898–900. That is, after affirming *Hensley*'s position that many of the *Johnson* factors "are subsumed within the initial calculation" of the lodestar, the Court specifically held in *Blum* that the "novelty and complexity of the issues," "the special skill and experience of counsel," the "quality of representation," and the "results obtained" from the litigation generally cannot serve as independent bases for increasing the base fee award because those considerations are fully reflected in the lodestar amount. *Id.* Upward adjustments of the lodestar figure, although still permissible, are proper only in certain "rare" and "exceptional" cases, supported by both detailed findings by the lower courts and specific evidence on the record. *See id.* at 898–901. And in a later ruling, the Court clarified that contingent fee arrangements also should not enhance the base lodestar:

> We note at the outset that an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the [base] lodestar. The risk of loss in a particular case (and, therefore, the attorney's contingent risk) is the product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits. The second factor, however, is ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so. Taking account of it again through lodestar enhancement amounts to double counting.

33

The first factor (relative merits of the claim) is not reflected in the [base] lodestar, but there are good reasons why it should play no part in the calculation of the award. It is, of course, a factor that *always* exists (no claim has a 100% chance of success), so that computation of the lodestar would never end the court's inquiry in contingent-fee cases.

*Burlington v. Dague*, 505 U.S. 557, 562–63 (1992) (citations omitted).

In its most current form, the lodestar method as described in *Blum* has achieved dominance in the federal courts and has "become the guiding light" for fee-shifting jurisprudence. *See Gisbrecht v. Barnhart*, 535 U.S. 789, 801 (2002) (quoting *Burlington*, 505 U.S. at 562)). As recently as 2010, the Court again outlined the value of the lodestar calculation. *See Perdue*, 559 U.S. at 551–57. The Court explained:

Although the lodestar method is not perfect, it has several important virtues. First, in accordance with our understanding of the aim of fee-shifting statutes, the lodestar looks to "the prevailing market rates in the relevant community." Developed after the practice of hourly billing had become widespread, the lodestar method produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case. Second, the lodestar method is readily administrable; and unlike the *Johnson* approach, the lodestar calculation is "objective" and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results.

*Id.* at 551–52 (citations omitted). The Court went on to observe that the presumptive reasonableness of the base lodestar calculation accounts for most of the *Johnson* factors:

[W]e have noted that "the lodestar figure includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee" and have held that an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation. We have thus held that the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors "presumably [are] fully reflected in the number of billable hours recorded by counsel." We have also held that the quality of an attorney's performance generally should not be used to adjust the lodestar "[b]ecause considerations

34

concerning the quality of a prevailing party's counsel's representation normally
are reflected in the reasonable hourly rate."

*Id.* at 553 (citations omitted) (second and third alteration in original). This remains the standard
for attorney's fee awards in federal courts today.

### b. *Arthur Andersen* **Factors and Lodestar in Texas Courts**

Similar to the federal system, Texas jurisprudence first developed a factor-based method
for the fact finder to assess what fees are reasonable and necessary, the cornerstone for shifting
attorney's fees away from the prevailing party. *See Arthur Andersen*, 945 S.W.2d at 818.
Like the Fifth Circuit in *Johnson*, this Court identified non-exclusive factors to guide the fact
finder in determining the reasonableness and necessity of attorney's fees. *See id.* Those factors
are:

> (1) the time and labor required, the novelty and difficulty of the questions
> involved, and the skill required to perform the legal service properly;
> (2) the likelihood . . . that the acceptance of the particular employment will
> preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the
> services; and
> (8) whether the fee is fixed or contingent on results obtained or uncertainty of
> collection before the legal services have been rendered.

*Id.* (quoting TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04, *reprinted in* TEX. GOV'T CODE, tit. 2,
subtit. G, app. A (TEX. STATE BAR R. art. X, § 9)). We explained that without evidence of the
factors identified in Disciplinary Rule 1.04, the fact finder has no meaningful way to determine
if the fees sought are in fact reasonable and necessary. *Id.* at 818–19. The factors were designed

to be applicable across all fee-shifting awards, whether determined by the jury or trial court. *See Young v. Qualls*, 223 S.W.3d 312, 314 (Tex. 2007) (per curiam).

In 2012, we provided additional guidelines for determining reasonableness and necessity by introducing the lodestar calculation to Texas jurisprudence. *See El Apple*, 370 S.W.3d at 760 (analyzing a fee award under the Texas Commission on Human Rights Act (TCHRA)); *see also* TEX. LAB. CODE § 21.259(a) ("In a proceeding under [the TCHRA], a court may allow the prevailing party . . . a reasonable attorney's fee as part of the costs."). We explained that:

> Under the lodestar method, the determination of what constitutes a reasonable attorney's fee involves two steps. First, the court must determine the reasonable hours spent by counsel in the case and a reasonable hourly rate for such work. The court then multiplies the number of such hours by the applicable rate, the product of which is the base fee or lodestar. The court may then adjust the base lodestar up or down (apply a multiplier), if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case.

*El Apple*, 370 S.W.3d at 760 (citations omitted). The relevant factors are straight from *Arthur Andersen*. *Id.* at 760–61.

We ultimately overturned the fee award in *El Apple* even though the trial court employed the lodestar method, concluding that the evidence was legally insufficient to support the reasonableness and necessity of the fee award. *Id.* at 763–64. The plaintiff's attorneys testified that they collectively spent 890 hours on the case (as estimated), and that those hours were attributed to "the number of discovery instruments and pleadings, the number of depositions and witness interviews, as well as the quality of representation." *Id.* at 759. They also testified that their time was reasonable and necessary given the results obtained and nature of the case. *Id.* But that was not enough. *See id.* at 762–63. The starting point for determining a lodestar fee

award, we noted, is the number of hours "reasonably expended on the litigation," and proof of reasonable hours "should include the basic facts underlying the lodestar, which are: (1) the nature of the work, (2) who performed the services and their rate, (3) approximately when the services were performed, and (4) the number of hours worked." *Id.* Applying that standard to the case, we held that the evidence was insufficient because:

> [N]either attorney indicated how the 890 hours they spent in the aggregate were devoted to any particular task or category of tasks. Neither attorney presented time records or other documentary evidence. Nor did they testify based on their recollection of such records. The attorneys instead based their time estimates on generalities such as the amount of discovery in the case, the number of pleadings filed, the number of witnesses questioned, and the length of the trial. While all this is relevant, it provides none of the specificity needed for the trial court to make a meaningful lodestar determination. The court could not discern from the evidence how many hours each of the tasks required and whether that time was reasonable. Without at least some indication of the time spent on various parts of the case, a court has little basis upon which to conduct a meaningful review of the fee award.

*Id.* at 763.

After *El Apple*, questions surfaced regarding whether the lodestar method applies in cases where the request for attorney's fees is not based on the TCHRA or other state statutes that require application of the lodestar method. But any doubt as to the lodestar method's applicability should have been resolved when we applied *El Apple*'s holding to a $339,000 award under a different fee-shifting statute that did not "require that attorney's fees be determined under a lodestar method." *City of Laredo v. Montano*, 414 S.W.3d 731, 736 (Tex. 2013) (per curiam); *see also* TEX. PROP. CODE § 21.019(c) (allowing courts to award reasonable and necessary attorney's fees incurred by a property owner successfully defending a condemnation suit). Although we did not explain why, the opinion made clear that we viewed

the lodestar method as having an expansive application to be used when evidence of reasonable hours worked multiplied by reasonable hourly rates can provide an objective analytical framework that is presumptively reasonable. *See Montano*, 414 S.W.3d at 736. Moreover, we gave additional guidance for sufficient proof when we determined that, like the proof in *El Apple*, the plaintiff's testimony in *Montano* was devoid of substance and could not support an award of reasonable attorney's fees. *See id.* We overturned the fee award, explaining that time estimates based on generalities were not sufficient to support a fee-shifting award:

> Gonzalez offered nothing to document his time in the case other than the "thousands and thousands and thousands of pages" generated during his representation of the Montanos and his belief that he had reasonably spent 1,356 hours preparing and trying the case. We rejected similar proof in *El Apple*.

> Gonzalez's testimony that he spent "a lot of time getting ready for the lawsuit," conducted "a lot of legal research," visited the premises "many, many, many, many times," and spent "countless" hours on motions and depositions is not evidence of a reasonable attorney's fee under lodestar. . . . In *El Apple*, we said that a lodestar calculation requires certain basic proof, including itemizing specific tasks, the time required for those tasks, and the rate charged by the person performing the work.

*Id.* (citations omitted).

A year after that, we again confirmed our position that the lodestar method applies when the fee claimant puts on evidence of reasonable fees by relating the hours worked multiplied by hourly rates for a total fee. *Long*, 442 S.W.3d at 255. We overturned the fee award in *Long*, just as we had in *El Apple* and *Montano*:

> Here, as in *El Apple* and *Montano*, the affidavit supporting the request for attorney's fees only offers generalities. It indicates that one attorney spent 300 hours on the case, another expended 344.50 hours, and the attorneys' respective hourly rates. The affidavit posits that the case involved extensive discovery, several pretrial hearings, multiple summary judgment motions, and a four and

38

one-half day trial, and that litigating the matter required understanding a related suit that settled after ten years of litigation. But no evidence accompanied the affidavit to inform the trial court [of] the time spent on specific tasks. . . . [W]ithout any evidence of the time spent on specific tasks, the trial court had insufficient information to meaningfully review the fee request.

*Id.* (citations omitted).

Based on our recent precedent, it should have been clear that the lodestar method developed as a "short hand version" of the *Arthur Andersen* factors and was never intended to be a separate test or method. *See Stewart Title*, 822 S.W.2d at 10 ("Although courts should consider several factors when awarding attorney's fees, a short hand version of these considerations is that the trial court may award those fees that are 'reasonable and necessary' for the prosecution of the suit."); *see also Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 744 (Tex. 2018) (remanding for a new trial to determine attorney's fees and referencing *Arthur Andersen* factors but citing *Bloyed*, 916 S.W.2d at 961, for the proposition that on remand, "any fee awarded . . . should be tested against the lodestar approach to prevent grossly excessive attorney's fee awards"). As we have explained, if the non-prevailing party is subject to paying the prevailing party's attorney's fees, the fees must be reasonable and necessary for success in prosecuting or defending the claim, and the award is intended to compensate the prevailing party generally for its legal representation. The lodestar method provides for this, as it is a focused and objective analysis of whether the fees sought are reasonable and necessary, yielding a base figure that reflects most *Arthur Andersen* factors and is thus presumptively reasonable. But that figure is subject to adjustment if the presumption is overcome by other factors not accounted for in the base lodestar figure.

39

Incidentally, as the court of appeals did in this case, some courts have decided that testimony about an attorney's experience, the total amount of fees, and the reasonableness of the fees complies sufficiently with *Arthur Andersen* to support an attorney's fee award. *See, e.g.*, 559 S.W.3d at 168; *Jeff Kaiser, PC v. State*, No. 03-15-00019-CV, 2016 WL 1639731, at *5 (Tex. App.—Austin Apr. 20, 2016, pet. denied) (mem. op.); *Jimoh v. Nwogo*, No. 01-13-00675-CV, 2014 WL 7335158, at *7 (Tex. App.—Houston [1st Dist.] Dec. 23, 2014, no pet.) (mem. op.); *Ferrant v. Graham Assocs. Inc.*, No. 02-12-00190-CV, 2014 WL 1875825, at *9 (Tex. App.—Fort Worth May 8, 2014, no pet.) (mem. op.); *Metroplex Mailing Servs.*, 410 S.W.3d at 900. We have clearly held, however, that generalities such as these are not sufficient to support a fee-shifting award under the lodestar method, which applies in fee-shifting situations. *See Long*, 442 S.W.3d at 255; *Montano*, 414 S.W.3d at 736; *El Apple*, 370 S.W.3d at 763.

Additionally, some courts of appeals have relied on our decision in *Garcia*, in which we stated that an attorney's testimony about his experience and his estimate of a reasonable and necessary fee in a case was "some evidence of a reasonable fee." 319 S.W.3d at 642; *see, e.g.*, *Barnett v. Schiro*, No. 05-16-00999-CV, 2018 WL 329772, at *10 (Tex. App.—Dallas Jan. 9, 2018, pet. filed) (mem. op.) (citing *Garcia* to say that an "attorney's brief testimony about experience, total amount of fees, and that [the] total amount of fees was reasonable and necessary is 'some evidence' of reasonableness of attorney's fees"). But as we explained in *El Apple*, *Garcia* involved a statute that required a trial court to dismiss a healthcare liability claim and award attorney's fees if the plaintiff did not timely serve an expert report.

*See El Apple*, 370 S.W.3d at 762 (citing *Garcia*, 319 S.W.3d at 641); *see also* TEX. CIV. PRAC. & REM. CODE § 74.351(b)(1) (mandating that if, "as to a defendant physician or health care provider, an expert report has not been served within [120 days], the court . . . shall . . . enter an order that: (1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred"). The report was not provided in *Garcia*, but the trial court did not award attorney's fees as required by the statute after the fee claimant testified briefly to his experience and his customary fee for handling a case up to the point of dismissal. *See Garcia*, 319 S.W.3d at 640–41. The court of appeals in *Garcia* affirmed, concluding that the attorney's testimony was conclusory and therefore no evidence of the reasonable attorney's fees incurred by Dr. Garcia. *Garcia v. Gomez*, 286 S.W.3d 445, 449 (Tex. App.—Corpus Christi–Edinburg 2008), *aff'd in part, rev'd in part*, 319 S.W.3d 638 (Tex. 2010). However, "[w]e concluded that the statute mandated the award of attorney's fees, on motion, and that the attorney's uncontested, albeit cursory, testimony about his fee, along with the other circumstances, *was enough to present the issue to the court*." *El Apple*, 370 S.W.3d at 762 (emphasis added) (citing *Garcia*, 319 S.W.3d at 641). But what we *did not say* was that such cursory testimony was sufficient to support an award of attorney's fees. *Garcia* is confined to a no-evidence challenge and should not be read, in any way, as a guiding statement on the standard for whether evidence is legally sufficient to support a fee-shifting award of attorney's fees.

Related to *Garcia* is our decision in *Kinsel v. Lindsey*, which likewise deals with the evidence to defeat a no-evidence challenge. We held:

> To support its claim for attorney's fees, counsel for the Kinsels testified regarding legal services rendered and various work performed through trial, each attorney's

41

related experience, and what factors each considered to determine a reasonable fee. Although the court of appeals found this testimony "lacking in specifics," it was "at the very least, the quantum of evidence found sufficient" by this Court in *Garcia v. Gomez*, 319 S.W.3d 638 (Tex. 2010). We agree.

526 S.W.3d at 427 (citation omitted). Because the claimant had not segregated legal fees accrued among the one recoverable and two non-recoverable claims, the court of appeals remanded the case to the trial court for a new trial on attorney's fees. *See Jackson Walker, LLP v. Kinsel*, 518 S.W.3d 1, 25–28 (Tex. App.—Amarillo 2015), *aff'd and remanded sub nom. Kinsel v. Lindsey*, 526 S.W.3d 411 (Tex. 2017). Having determined that the claimant presented some evidence of fees incurred on the recoverable claim, we affirmed the remand for a redetermination of fees. *See Kinsel*, 526 S.W.3d at 427–28. As in *Garcia*, our opinion in *Kinsel* addressed only the quantum of proof required to defeat a no-evidence challenge.

### c. Applicable Standard for Proving Reasonable Attorney's Fees

### (1) Base Calculation: Time x Rate = Presumptively Reasonable

It should have been clear from our opinions in *El Apple*, *Montano*, and *Long* that we intended the lodestar analysis to apply to any situation in which an objective calculation of reasonable hours worked times a reasonable rate can be employed. We reaffirm today that the fact finder's starting point for calculating an attorney's fee award is determining the reasonable hours worked multiplied by a reasonable hourly rate, and the fee claimant bears the burden of providing sufficient evidence on both counts. *See El Apple*, 370 S.W.3d at 760. Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate

for each person performing such services. *See id.* at 762–63. This base lodestar figure should approximate the reasonable value of legal services provided in prosecuting or defending the prevailing party's claim through the litigation process. *Cf. Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989) (explaining that a fee-shifting statute "contemplates reasonable compensation . . . for the time and effort expended by the attorney for the prevailing [party], no more and no less"). And the lodestar calculation should produce an objective figure that approximates the fee that the attorney would have received had he or she properly billed a paying client by the hour in a similar case. *See Perdue*, 559 U.S. at 551 (noting that "the lodestar method produces an award that *roughly* approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case" (emphasis in original)). This readily administrable and objectively reasonable calculation is the standard for calculating the reasonableness and necessity of attorney's fees in a fee-shifting situation. *See id.* at 551–52 (recognizing that the lodestar method is administrable and objective, cabins discretion of trial court judges, permits meaningful judicial review, and produces reasonably predictable results).

It is worth repeating that because fee-shifting awards are to be reasonable and necessary for successfully prosecuting or defending against a claim, reasonableness and necessity are not dependent solely on the contractual fee arrangement between the prevailing party and its attorney. *Cf. Blanchard*, 489 U.S. at 96 (explaining that "[f]ee awards are to be reasonable, reasonable as to billing rates and reasonable as to the number of hours spent in advancing the successful claims"); *Del. Valley Citizens' Council*, 478 U.S. at 565 (explaining that fee-shifting

statutes are not "intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client"); *see also Arthur Andersen*, 945 S.W.2d at 818–19 (holding that although "[a] contingent fee may indeed be a reasonable fee from the standpoint of the parties to the contract," it is not "in and of itself reasonable for purposes of shifting that fee to the defendant"; the fact finder is still required to "decide the question of attorney's fees specifically in light of the work performed in the very case for which the fee is sought"). Therefore, the base lodestar calculation should reflect hours reasonably expended for services necessary to the litigation. *See Hensley*, 461 U.S. at 434 ("Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission."); *El Apple*, 370 S.W.3d at 762 ("Charges for duplicative, excessive, or inadequately documented work should be excluded." (citing *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993))). Likewise, the base calculation should reflect a reasonable hourly rate for the attorney to prosecute or defend successfully against the claim at issue.[10] *See Perdue*, 559 U.S. at

---

[10] We recognize that when fee agreements provide for arrangements other than hourly billing, the attorney will not be able to present evidence of a particular hourly rate billed or paid for the services performed. In those instances, the fee claimant, through its expert, has the burden of showing that the rate claimed for purposes of the base lodestar calculation reflects a reasonable market rate given considerations in *Arthur Andersen*, including the attorney's experience and expertise, the novelty and complexity of the questions involved, any special skill required for the representation, the attorney's risk in accepting such representation, which may be reflected in a contingent fee agreement, and any other considerations that would factor into an attorney's fee negotiations if the attorney were to bill hourly. *See Burlington*, 505 U.S. at 566 (noting that "attorneys factor in the particular risks of a case in negotiating their fee"); *Del. Valley Citizens' Council*, 478 U.S. at 566 (recognizing that "considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate"); *Arthur Andersen*, 945 S.W.2d at 818–19 (explaining that for contingent fee cases, the jury must decide reasonable and necessary fees in light of the work performed in that case, and reflecting the non-exclusive list of factors, arriving at a specific dollar amount). In this way, the contingent nature of a fee agreement, or the nature of an alternative fee arrangement, is taken into account in calculating the presumptively reasonable fee in the first step of the analysis, prior to any potential adjustments for *Arthur Andersen* factors that have not yet been considered, as discussed below. *See infra* Part IV.B.2.c.(2).

551–56 (recognizing that the lodestar method "[d]eveloped after the practice of hourly billing had become widespread" and provides a rough approximation of such billing practices, but "if hourly billing becomes unusual, an alternative to the lodestar method may have to be found"); *Missouri v. Jenkins*, 491 U.S. 274, 283 (1989) (stating that fee-shifting awards for attorney's fees "are to be based on market rates for the services rendered"); *Blum*, 465 U.S. at 895 n.11 (recognizing that "determining an appropriate 'market rate' for the services of a lawyer is inherently difficult," as rates are based on supply and demand in a particular community, as well as on a lawyer's experience, skill, and reputation; however, a rate shown to be "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation" is "normally deemed to be reasonable").  In light of our recent attorney's fees jurisprudence, we clarify today that there is a presumption that the base lodestar calculation, when supported by sufficient evidence, reflects the reasonable and necessary attorney's fees that can be shifted to the non-prevailing party.  *See El Apple*, 370 S.W.3d at 760; *see also Perdue*, 559 U.S. at 551–52; *Blum*, 465 U.S. at 897 (explaining that the base lodestar figure is presumed reasonable if the claimant "has carried his burden of showing that the claimed rate and number of hours are reasonable").

### (2) Enhancing or Reducing Base Calculation

Some commentators have opined that our willingness to apply the lodestar method to any situation in which an attorney testifies to reasonable hours multiplied by reasonable rates—as we did in *Long* and *Montano*—renders *El Apple*'s two-step process invalid.  *See, e.g.*, Mark E. Steiner, *Will* El Apple *Today Keep Attorneys' Fees Away?*, 19 J. CONSUMER & COM. L. 114, 117

(2016) (expressing that both *Long* and *Montano* "appear to apply the term 'lodestar' to any situation that involves recovering attorneys' fees on the basis of 'reasonable hours times reasonable rate.' There is no sense that lodestar is a two-step process, which is how the Court had described it in *El Apple*"). To the contrary, both *Long* and *Montano* analyzed the issue of whether the evidence was sufficient under our precedent dealing with the lodestar method—based on *El Apple*. *See Long*, 442 S.W.3d at 255; *Montano*, 414 S.W.3d at 736. Our opinions in *Long* and *Montano* referenced and followed *El Apple*, and both resulted in remand to the trial court for redetermination of attorney's fees. *See Long*, 442 S.W.3d at 255–56; *Montano*, 414 S.W.3d at 736–37. The second part of *El Apple*'s two-step analysis—adjusting the base calculation up or down based on relevant considerations—remains very much intact. Like our federal counterpart, we recognize that the base lodestar figure accounts for most of the relevant *Arthur Andersen* considerations.[11] *See Arthur Andersen*, 945 S.W.2d at 818; *cf. Perdue*, 559 U.S. at 553; *Burlington*, 505 U.S. at 562–63; *Blum*, 465 U.S. at 898–900. And an enhancement or reduction of the base lodestar figure cannot be based on a consideration that is subsumed in the first step of the lodestar method. *Cf. Perdue*, 559 U.S. at 553 (reaffirming that a lodestar enhancement may not be based on a factor that is included in the base lodestar calculation). As in the federal courts, the base lodestar calculation usually includes at least the following considerations from *Arthur Andersen*: "the time and labor required," "the novelty and difficulty of the questions involved," "the skill required to perform the legal service properly," "the fee customarily charged in the locality for similar legal services,"

---

[11] Although *Arthur Andersen* speaks in terms of factors, we employ the term "considerations" because there are multiple considerations within some of the factors.

"the amount involved," "the experience, reputation, and ability of the lawyer or lawyers performing the services," "whether the fee is fixed or contingent on results obtained," "the uncertainty of collection before the legal services have been rendered," and "results obtained."[12] *See Arthur Andersen*, 945 S.W.2d at 818; *cf. Perdue*, 559 U.S. at 553 (noting that the base lodestar calculation appropriately accounts for the novelty and complexity of a case because those considerations are presumably "fully reflected in the number of billable hours recorded by counsel," and that the quality of the attorney's performance is likewise already accounted for because "considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate" (quoting *Blum*, 465 U.S. at 898; *Del. Valley Citizens' Council*, 478 U.S. at 566)); *Burlington*, 505 U.S. at 562–63 (disallowing an enhancement for contingency because it would likely duplicate in substantial part considerations already subsumed in the base lodestar calculation, as "[t]he risk of loss in a particular case (and, therefore, the attorney's contingent risk) . . . is ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so"). These considerations therefore may not be used to enhance or reduce the base calculation to the extent

---

[12] Because attorney's fee determinations in federal court are within the district court's discretion, the "results obtained" factor is generally considered in calculating the base lodestar, and thus "it normally should not provide an independent basis for increasing the fee award." *Blum*, 465 U.S. at 900; *see also Perdue*, 559 U.S. at 554 (considering "results obtained" in conjunction with superior attorney performance and indicating that in rare and exceptional circumstances where specific evidence demonstrates that the base lodestar fee would not have been "adequate to attract competent counsel," superior attorney performance may justify an enhancement (quoting *Blum*, 465 U.S. at 897)). In Texas courts, the base lodestar calculation of reasonable hours times a reasonable rate should account for any results obtained up to trial. But to the extent that the results obtained are not reflected in the base lodestar, then the fact finder may determine whether the results obtained consideration necessitates an adjustment to achieve a reasonable fee under the second step of the lodestar method. *Cf. Barker v. Eckman*, 213 S.W.3d 306, 313–14 (Tex. 2006).

that they are already reflected in the reasonable hours worked and reasonable hourly rate. If a fee claimant seeks an enhancement, it must produce specific evidence showing that a higher amount is necessary to achieve a reasonable fee award. *See Perdue*, 559 U.S. at 553 (observing that the requirement of "specific evidence" is essential "if the lodestar method is to realize one of its chief virtues, *i.e.*, providing a calculation that is objective and capable of being reviewed on appeal"); *El Apple*, 370 S.W.3d at 760. Likewise, if a fee opponent seeks a reduction, it bears the burden of providing specific evidence to overcome the presumptive reasonableness of the base lodestar figure.

### d. Standard Summary

To summarize, the lodestar method as we presented it in *El Apple* applies for determining the reasonableness and necessity of attorney's fees in a fee-shifting situation:

> Under the lodestar method, the determination of what constitutes a reasonable attorney's fee involves two steps. First, the [fact finder] must determine the reasonable hours spent by counsel in the case and a reasonable hourly rate for such work. The [fact finder] then multiplies the number of such hours by the applicable rate, the product of which is the base fee or lodestar. The [fact finder] may then adjust the base lodestar up or down (apply a multiplier), if relevant factors indicate an adjustment is necessary to reach a reasonable fee in the case.

370 S.W.3d at 760 (citations omitted). Thus, the fact finder must first determine a base lodestar figure based on reasonable hours worked multiplied by a reasonable hourly rate. *Id.* In a jury trial, the jury should be instructed that the base lodestar figure is presumed to represent reasonable and necessary attorney's fees, but other considerations may justify an enhancement or reduction to the base lodestar; accordingly, the fact finder must then determine whether evidence of those considerations overcomes the presumption and necessitates an adjustment to reach a

reasonable fee. *Id.* at 765; *see also Perdue*, 559 U.S. at 558–59 (suggesting that adequate appellate review is only feasible when the fact finder makes reasonably specific findings as to each step of the fee determination). *Arthur Andersen* lists relevant considerations that may justify an adjustment, but as explained above, considerations already incorporated into the base calculation may not be applied to rebut the presumption that the base calculation reflects reasonable and necessary attorney's fees. *See Arthur Andersen*, 945 S.W.2d at 818; *cf. Perdue*, 559 U.S. at 553; *Burlington*, 505 U.S. at 562–63; *Blum*, 465 U.S. at 898–900. General, conclusory testimony devoid of any real substance will not support a fee award. Thus, a claimant seeking an award of attorney's fees must prove the attorney's reasonable hours worked and reasonable rate by presenting sufficient evidence to support the fee award sought. *See Long*, 442 S.W.3d at 255–56; *Montano*, 414 S.W.3d at 736–37; *El Apple*, 370 S.W.3d at 763–64. Sufficient evidence includes, at a minimum, evidence of (1) particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services. *See El Apple*, 370 S.W.3d at 762–63.

As the United States Supreme Court has observed, "[t]he lodestar method was never intended to be conclusive in all circumstances"; rather, "there is a 'strong presumption' that the [base] lodestar figure is reasonable, but that presumption may be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Perdue*, 559 U.S. at 553–54. Thus, the second step of the lodestar method allows for the base lodestar figure to be adjusted up when

49

considerations not already accounted for in the first step establish that the base lodestar figure represents an unreasonably low fee award, depriving fair compensation to the prevailing party's attorney. Likewise, the base lodestar figure can be adjusted down when it is established, based on considerations not already accounted for in the first step, to be an unreasonably high or excessive fee award, creating a windfall for the prevailing party or its attorney.[13]

### e. Billing Records

Contemporaneous billing records are not required to prove that the requested fees are reasonable and necessary. *See El Apple*, 370 S.W.3d at 763; *see also Montano*, 414 S.W.3d at 736 (explaining that "*El Apple* does not hold that a lodestar fee can only be established through time records or billing statements"). Nevertheless, billing records are *strongly* encouraged to prove the reasonableness and necessity of requested fees when those elements are contested. In *El Apple*, we acknowledged the value of contemporaneous records for lodestar calculations:

> An attorney could, of course, testify to these details, but in all but the simplest cases, the attorney would probably have to refer to some type of record or documentation to provide this information. Thus, when there is an expectation that the lodestar method will be used to calculate fees, attorneys should document their time much as they would for their own clients, that is, contemporaneous billing records or other documentation recorded reasonably close to the time when the work is performed.

370 S.W.3d at 763; *see also id.* at 762 (observing that hours "not properly billed to one's client also are not properly billed to one's adversary" under a fee-shifting statute (quoting *Hensley*, 461 U.S. at 434)). Creating the documents makes them available for production, provides a basis for

---

[13] We emphasize that, pursuant to an attorney–client fee agreement, a client could ultimately owe its attorney more fees than the amount of the award shifting fees to the non-prevailing party. However, fact finders should be concerned with awarding reasonable and necessary fees, not with any contractual obligations that may remain between the attorney and client.

testifying as to the reasonableness and necessity of the requested fees, and permits cross-examination.

Importantly, however, we are not endorsing satellite litigation as to attorney's fees. The fact finder will generally not benefit from attorneys cross-examining each other point-by-point on every billable matter. *See Hensley*, 461 U.S. at 437 ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee. Where settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates."). Parties should use discovery and pretrial procedure to evaluate attorney's fee claims and the evidence supporting them, then present to the fact finder the evidence relevant to determining a reasonable and necessary fee as discussed in this opinion.

### 3. Howard's Testimony

Finally, we consider the evidence presented at trial supporting the award of attorney's fees. As mentioned, the trial court awarded $1,025,000 in attorney's fees, including the conditional awards. Because UTSW secured the attorney's fees in the final judgment over Rohrmoos, we focus on the testimony of UTSW's attorney, Wade Howard. On direct examination, Howard testified that "all I've done for my 20 years" of legal experience is litigation. "The standard rate[] that I charge is generally around $430 an hour. I know that sounds ridiculously high. I often think myself it is ridiculously high. But it is -- it pays for a lot of things," namely, the logistics of running a law firm. Howard then stated:

> I have handled cases similar in nature to this. . . . [A] reasonable and necessary
> amount of hours in this case, I would think would be at around 750 to 1,000

51

hours. So that would put the attorney's fees at my rate somewhere in the 3 to $400,000 range. Again, I know that sounds very high, but I do believe based on my experience, 20 years of experience in the legal profession, and handling these types of cases at this magnitude that [this] is really what would be a reasonable and necessary fee if this case were worked up by both sides in a reasonable and necessary fashion.

Howard went on:

This case, for whatever reason, has not been worked up in a reasonable fashion. Now, of course, I'm going to say that I've put most of that on the other side. And I'll talk about that in a little more detail. But because of that, the fees in this case are much closer -- my fees are much closer to 800 -- over $800,000. Now, I will be the first to admit, that is a ridiculous number. Okay. They should never have gotten [that] high.

Howard explained how Rohrmoos's actions, in his view, caused the fees to reach such a high amount. He talked about the volume of document production, saying his firm had to "search literally millions of emails to find the documents that you see here in the courtroom. And we [had] to review all of those emails when we [ran] our searches to make sure that they're relevant to this case and also that they don't contain any patient information."[14]

Next, Howard described having to produce large numbers of hard-copy documents. "It was about 60 bankers boxes of documents," Howard said, and "[t]hose bankers boxes will hold -- the small ones will hold around 3,000 pages, the larger ones around 7,000 pages of documents." Tasked with reviewing all those documents were the paralegals, who bill the client for their time. They "had to go through every single one of those documents, page by page, and

---

[14] On cross-examination, Howard explained that it was probably "tens of millions" of documents, rather than just "millions," but they did not have to physically review each document. Computer software designed for discovery in litigation narrowed down the final number to around "hundreds of thousands of pages of documents that we put eyes on."

remove all of the old patient files that we had in [those] boxes of documents. . . . That's one of the reasons why the costs in this case have gotten so ridiculously high."

From there, Howard went to depositions. "Okay. When somebody -- when a witness gets deposed, both sides have to prepare for the deposition. Then you have to go to the deposition. Then you have time reviewing the deposition afterwards, getting it summarized and making it ready for if it's actually called to trial." Those get expensive, "[s]o that's another thing that's contributed." Howard testified summarily that more than forty depositions occurred in this case. He then ended with an analogy aimed at shedding light on Rohrmoos's actions:

> [I]t's kind of like when you go to the doctor and the doctor says, I think I need to run the following tests. You, as the patient, just kind of go, okay. . . . And when a lawyer has that kind of control, they can just run up the fees. They can just say, oh, I need to investigate this. I need to do research on that. I want to file a motion on that.

This all led to a lengthy discussion of motion practice. "I think [there were] four or five motions to compel" and a forty-page motion for summary judgment. Howard explained:

> I can tell you from my experience, to draft a motion of that length is expensive. Probably was 30, $40,000 to draft that type of detailed motion on the law.
>
> I then have to respond to it. I file my response. He then filed a 30 or 35-page what they call reply to my response. Then we have to have a hearing on it. Lasted for several hours. That one motion alone, probably cost the parties $80,000. And in my opinion, it just wasn't necessary. It wasn't reasonable. It wasn't necessary. And it just caused both parties to spend a lot of money that wasn't necessary.
>
> And so, you know, again, I'm sure when [opposing counsel] takes the stand, he's going to say, I've done things that have run on up the cost. The simple reality is, both parties probably have to take some blame. The costs got way out of control here and the fees were not reasonable or necessary. I think the 3 to $400,000 range is where fees are reasonable and necessary. I do think, however, that if you find that we prevail in this case, that our fees should be something higher than

53

that. I won't even wager a guess as to what it should be higher than that. Whatever you think is necessary. But I think our fees were higher than what were reasonable and necessary because we had to respond to all of the experts that [opposing counsel] designated. We had to appear at all the depositions that he noticed. I can't just ignore those things.

So, if we prevail, I think our fees should be somewhat higher [than] the 3 to $400,000 range, but I'll leave that to your discretion. But I will tell you that if both sides had just approached this case in a reasonable fashion, the fees in this case should not have exceeded 3 or $400,000.

That concluded Howard's direct testimony. Rohrmoos's counsel immediately moved to strike it, asserting that Howard did not comply with the *Arthur Andersen* factors to prove the reasonableness of the fees. The trial court denied the motion after Howard responded, "The amount in controversy, Your Honor, the complexity of the case, my knowledge and experience. I think that's really the factors that were relevant in this case." The court of appeals then affirmed the award, holding that "Howard's testimony concerning his experience, the total amount of fees, and the reasonableness of the fees charged was sufficient to support the award" under *Arthur Andersen*. 559 S.W.3d at 168.

We understand Howard's testimony that $800,000 in attorney's fees for trial work may seem unreasonable for a breach of lease case that implicated roughly $300,000 in damages.[15]

---

[15] Indeed, Rohrmoos requested $1,300,000 in attorney's fees. Even the trial court was baffled by the high amount of attorney's fees for a breach of lease case.

THE COURT: Okay. So, now, let's go [back] to the amount [of attorney's fees].
MR. HOWARD: Yes, Your Honor.
THE COURT: We all had those discussions both on the record and off the record of what this court's impression was of the attorney's fees and how this case was driven. I believe that defense counsel testified to how much in attorney's fees?
MR. HOWARD: $1.3 million, Your Honor, for the landlord. And there were --
THE COURT: And how much was -- how much rent did you owe if you had lost?
MR. HOWARD: The less than 300.
THE COURT: $300,000. And the attorney's fees for defendant, once again, were how much?
MR. HOWARD: The landlord's were $1.3 million.

We also understand Howard's position that opposing counsel's actions drove the cost of litigation, in most instances, and that made UTSW's $800,000 in requested attorney's fees necessary, even reasonable.[16] However true this may be, Howard's justification for why his fees should be $800,000—searching through "millions" of emails and reviewing "hundreds of thousands" of papers in discovery, more than forty depositions taken, and a forty-page motion for summary judgment—is too general to establish that the requested fees were reasonable and necessary. Without detail about the work done, how much time was spent on the tasks, and how he arrived at the $800,000 sum, Howard's testimony lacks the substance required to uphold a fee award. *See Long*, 442 S.W.3d at 255–56; *Montano*, 414 S.W.3d at 736–37; *El Apple*, 370 S.W.3d at 763–64. Attorneys should not have to take the stand for days and testify to every

---

THE COURT: And how much did -- were you yours?
MR. HOWARD: Ours were over $800,000.
THE COURT: On a breach of lease case?
MR. HOWARD: Yes, Your Honor.
THE COURT: And if you moved out and you move out too early, before the term of the lease was up, how much would you have owed had you lost, one more time?
MR. HOWARD: Less than $300,000.
THE COURT: Think about it. Thank you. All right. You can continue.

[16] Howard explained himself to the court:

Which is exactly why, Your Honor, that what I testified to was that the reasonable necessary fees in this case should have been in the 3 to $400,000. But primarily because of the Defendant's conduct, hiring twelve experts –

. . . .

[The Defendants] spent $1.3 million [in attorney's fees]. Of course, I'm -- you know, he notices up 37 depositions including, you know, 15 third-party depositions, I have to attend. He hires twelve experts. You know, I have to depose them and know what they're going to say. And all of that evidence came in about all the things that the landlord did that caused the Plaintiff to incur significantly more fees than what should have been reasonable and necessary. But if you recall, I did say that we did have to do those. They were reasonable. They were necessary. The amount charged was reasonable. The time spent doing those tasks was reasonable. It just -- the actions they took.

detail of a three-year-long case, but they must provide more than what Howard has said here. We conclude that Howard's testimony is legally insufficient to support the attorney's fee award.

## V. Conclusion

In summary, we hold that a commercial tenant can terminate a commercial lease based on the landlord's prior material breach. Our holding is not inconsistent with *Davidow v. Inwood North Professional Group–Phase I*, 747 S.W.2d 373 (Tex. 1988). We affirm the court of appeals' judgment as to breach of the implied warranty of suitability, but on different grounds. We also hold that the evidence used to prove attorney's fees is not legally sufficient to support the fee award. Because the record does not provide the requisite details to support a fee award, we reverse the court of appeals' judgment as to the attorney's fee award and remand the case to the trial court for a redetermination of fees consistent with this opinion.

_____
Paul W. Green
Justice

OPINION DELIVERED:  April 26, 2019